NEWMAN, Circuit Judge,
dissenting.
The only issue on this appeal is whether to preserve the status quo during this litigation, or whether to change it irretrievably. The Supreme Court has reminded us that the grant or denial of a preliminary injunction requires consideration of the equities as between the parties, as well as the probable outcome of the case upon trial. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). In a case in which the outcome is uncertain at the preliminary stage, the equities may nonetheless loom large. With respect to this case, although the panel majority mounts a one-sided argument against patent validity, the patent carries the presumption of validity, and the arguments presented by my colleagues were previously considered and rejected during patent examination.
In contrast, the equities in this case weigh on the side of preserving the status *53 quo during the litigation. The patentee Roche had established, for the first time, that the medicament ibandronate can be effectively and safely administered once a month in the dosage of 150 mg, and conducted the panoply of biological and clinical evaluations needed to bring such a product to public benefit. It was necessary to establish not only that once-a-month administration is effective, but also to find the effective monthly dosage, and to establish that this dose can safely be ingested all at once, without undesirable side effects. To establish this efficacy and safety and dosage, the proceedings for regulatory approval consumed millions of dollars, in three “phases” of clinical trials involving thousands of postmenopausal women, and requiring 12 years of costly effort. Pls.’ Mem. Supp. Mot. Prelim. Inj. 4. Roche’s successful product Boniva® was the result of heavy risk-laden investment — investment for which the defendants now seek the benefits, having borne neither the cost, nor the risk of failure.
As equitable factors, the patentee’s initiative and commitment and investment, as compared with the defendants who seek only the successful products of others, warrant appropriate weight in deciding whether the status quo should be preserved until the challenge to patent validity is decided. Economic factors are not irrelevant to the equities. Cf. Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 5.Ct. 1798, 72 L.Ed.2d 91 (1982) (“The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular ease. Flexibility rather than rigidity has distinguished it.” (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944))). In determining whether Roche must share the benefits of its efforts before expiration of the patent on which Roche relied in making these efforts, the economic equities should not be ignored.
The district court, in considering the likelihood of outcome, apparently refused to consider Roche’s evidence of unpredictable results. The district court simply found that a single 150 mg once-a-month dosage of ibandronate would have been obvious because 150 mg is 30 times 5 mg, which was a daily dose disclosed in the prior art. One must wonder at the need for twelve years of experimental determination of efficacy and safety, were the result as clear and inexorable as the judges now find.
Roche’s expert, Dr. Anastasia Daifotis, explained that the oral absorption of iban-dronate is non-linear for doses larger than 50 mg, testifying that “orally administered Boniva® resulted in similar bioavailability in amounts up to 50 mg” but “the serum levels of ibandronate increase disproportionately if doses greater than 50 mg are administered.” J.A. 38127-28 ¶ 108. Dr. Daifotis cited data which show the disproportionate uptake of ibandronate into the blood stream for a monthly 150 mg dose over monthly 50 mg and 100 mg doses, and over a mixed regimen consisting of a 50 mg first dose, followed by two monthly oral doses of 100 mg (50/100 mg):
*54 [[Image here]]
J.A. 38132 ¶ 112 (Reginster et al., Monthly Oral Ibandronate Is Well Tolerated and Efficacious in Postmenopausal Women: Results From the Monthly Oral Pilot Study, J. Clin. Endocrin. Metab., Vol. 90, pp. 5018-24 (2005)). Dr. Daifotis explained that “[t]his was a surprising finding concerning the disproportionate amount of ibandronate that becomes available from oral administration of amounts above about 50 mg, and it was unknown as of May 2002,” J.A. 38127-28 ¶ 108. Dr. Daifotis explained that “[t]he benefit of this surprising result was that a patient could receive higher than thought possible amounts of active drug to be available to inhibit osteoclasts, while at the same time not adversely affecting the safety profile of a 150 mg dose of ibandronate,” J.A. 38133 ¶ 115.
Dr. Daifotis stated that later clinical testing showed that the 150 mg dose monthly is superior to the 2.5 mg daily dosage of ibandronate that had been approved for the treatment and prevention of postmenopausal osteoporosis. J.A. 38133-35 ¶¶ 116-19. She cited clinical trial data showing that a 150 mg monthly dose of ibandronate is “superior” at increasing bone density in the lumbar spine of postmenopausal women, as compared to 100 mg and 50/50 mg monthly doses and a 2.5 mg daily dose:
*55 [[Image here]]
J.A. 38135 ¶ 118 (Miller et al., Monthly Oral Ibandronate Therapy in Postmenopausal Osteoporosis: 1-Year from the Mobile Study, J. Bone Miner. Res., Vol. 20, pp. 1315-22 (2005)). This experimental evidence refutes the defendants’ contention, apparently accepted by my colleagues, that the 150 mg once-a-month dose was a matter of simple arithmetic. The evidence was that the dosage amount and effectiveness were unexpected and unpredicted, and required extensive clinical testing, due to ibandronate’s unique pharmacokinetic and bioavailability profile in the human body.
My colleagues state that the district court properly declined to consider this evidence, arguing that Roche only “ineor-porate[d] by reference” arguments from its concurrent summary judgment briefs. Maj. op. at 52. However, both parties referred the district court to their summary judgment briefs.[1] See Pls.’ Reply Mem. Supp. Mot. Prelim. Inj. 8 (“To avoid repetition, Plaintiffs incorporate by reference their opposition to Defendants’ motion for summary judgment of obviousness.”); Defs.’ Mem. Opp’n Pls.’ Mot. Prelim. Inj. 21 (“Defendants have already addressed the matters in Defendants’ Obviousness Brief and will be addressing them further in their reply brief.”). The record states that the district court approved this practice. See D.Ct. op. at 6 (“The parties reference the briefs filed in regard to a pending motion for summary judgment that the '634 patent is invalid based on obviousness.”).
In the section of the Plaintiffs’ summary judgment brief entitled “Unexpected Results,” Roche discusses evidence that “it was unexpected that the 150 mg monthly oral dose of ibandronate was found superi- or to 2.5 mg daily ibandronate.” J.A. *56 24835. Of record were the reports of Roche’s experts Dr. Bilezikian, Dr. Daifo-tis, and Dr. Harris, and Roche explained that “each opines that, at the time of the inventions, a POSA would not have had any reasonable expectation of succeeding with a safe, effective, and well-tolerated once-monthly oral dosage of ibandronate in an amount as large as 150 mg.” J.A. 24836. At the preliminary injunction hearing Dr. Bilezikian, Plaintiffs’ expert witness, corrected the Defendants’ mistaken premise that oral bioavailability of amino bisphosphonates is fixed, explaining that “there’s a huge range” based in part on “absorption kinetics.” J.A. 205.
By not considering this evidence, “the district court contravened this court’s precedent requiring that a fact finder consider all evidence relating to obviousness before finding a patent invalid on those grounds.” In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1075 (Fed.Cir.2012).
In view of the presumption of validity, 35 U.S.C. § 282, “an alleged infringer who raises invalidity as an affirmative defense has the ultimate burden of persuasion to prove invalidity by clear and convincing evidence, as well as the initial burden of going forward with evidence to support its invalidity allegation.” Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1376 (Fed.Cir.2009) (citing Tech. Licensing Corp. v. Videotek, Inc., 545 F.3d 1316, 1327 (Fed.Cir.2008)). “If the trial court determines that the challenger’s evidence is sufficient to raise ‘a substantial question’ of invalidity, the trial court must then afford the patentee the opportunity to show that the invalidity defense ‘lacks substantial merit.’” Titan Tire, 566 F.3d at 1378. Such evidence must be considered, whether the issue is of likelihood or of finality. See Cyclobenzaprine, 676 F.3d at 1078 (all evidence relevant to obviousness or nonob-viousness must be considered).
Moreover, it is harder for the party asserting invalidity to meet its burden “when ... the infringer attempts to rely on prior art that was before the patent examiner during prosecution.” Glaxo Group Ltd. v. Apotex, Inc., 376 F.3d 1339, 1348 (Fed.Cir.2004) (quotations omitted). In this case, all of the references considered by the district court were previously considered by the PTO and rejected. See D.Ct. op. at 16 (“Weighing in favor of Plaintiffs is the undisputed fact that all of the prior art brought forward by Defendants on this motion was before the examiner during prosecution of the patents.”). Thus the finding that the examiner considered and rejected the asserted prior art weighs strongly against a preliminary finding that the patented subject matter is likely to be ruled obvious as a matter of law.
Although the issue at this stage is solely that of likelihood, the panel majority opinion recites only the evidence that weighs on the side of invalidity, ignoring the contrary evidence, and discarding the effect of the burden of proof. No mention is made of the equities that apply at the preliminary injunction stage. When the equities are considered, and on an objective view of the facts of patent validity, the fair and just action is to preserve the status quo during the litigation. See Apple, Inc. v. Samsung Electronics Co., Ltd., 678 F.3d 1314 (Fed.Cir.2012) (in determining whether to issue a preliminary injunction, the court must consider the equitable factors of hardship and public interest along with the likelihood that the patent is invalid). From my colleagues’ unbalanced analysis of the issue of obviousness, and their failure to consider the equitable factors that weigh heavily for preserving the status *57 quo during the litigation, I respectfully dissent.

. Apotex’s Mot. for Summ. J. (Feb. 10, 2012); Roche’s Mot. for Prelim. Inj. (Feb. 11, 2012); Apotex's Resp. to Mot. for Prelim. Inj. (Feb. 21, 2012); Roche's Resp. to Mot. for Summ. J. (Feb. 21, 2012); Apotex’s Resp. to Mot. for Summ. J. (Feb. 29, 2012); Roche's Reply to Mot. for Prelim. Inj. (Feb. 29, 2012); Apotex’s Reply to Mot. for Summ. J. (March 2, 2012).